The opinion of the court was delivered by
Valentine, J.:
This was an action, brought by Thompson Trosper against the city of Salina, for damages alleged to-have been caused by the negligence of the city of Salina in permitting and allowing a hole, an excavation, an area, or cellar-way, to be dug and created within the space properly belonging to one of the sidewalks of one of the principal streets of the city of Salina, and permitting such hole or cellar-way to be left uncovered, unprotected and unguarded, so-that the plaintiff, in passing along the sidewalk, inadvertently, and without any fault on his part, fell into said hole or cellar-way and was injured. The case was tried by the court below and a jury, and judgment was rendered in favor of the plaintiff and against the defendant for $4,030; and the defendant now, as plaintiff in error, complains of such judgment, and seeks to have it reversed by this court.
The injury occurred on the night of April 29, 1878. This-action was brought on March 17, 1879. The trial was commenced on August 23, 1880. The verdict and special findings of the jury were rendered on September 2, 1880; and on September 4, 1880, the defendant filed a motion for judgment on the special findings of the jury, notwithstanding the-general verdict; and also filed a motion fora new trial, upon, various grounds, which motions were overruled by the court below, and the judgment aforementioned was rendered by the court below on the same day. Afterward a case was made for the supreme court, which case, together with the petition in error, was filed in this court on September 3,1881. This case contains six hundred and ten pages, nearly all of which are printed by a type-writer. In addition to the case- *547 made, the petition in error contains seven large pages, printed by a type-writer, and contains sixty-two assignments of error, every one of which is still insisted upon by the plaintiff in error, defendant below; and the brief of plaintiff in error contains seventy-one printed pages. The.proceedings in the court below were taken and preserved by a stenographer, and almost everything that transpired during the trial has been preserved and embodied in the case-made. Stenography is generally a very valuable thing in enabling parties to preserve the proceedings had in courts of justice. Sometimes, indeed, it is almost indispensable for that purpose, and generally it might be made beneficial to courts, parties, and practitioners; but sometimes, in the hands of some practitioners, it is made an intolerable evil, instead of a welcomed benefit. Upon this point, we quote from^ volume 14 of the Central Law Journal, page 81, as follows:
“The facility which this system affords of referring to whatever has transpired during the trial has led to a loose, careless practice of introducing evidence pell-mell, with but little consideration as to its effect or the logical relation of the various parts of it. This, and the readiness of the courts to regard cases which attract the attention of the public and consequently make a noise through the press, as. presenting grave difficulty, and consequently allowing counsel more than usual latitude in the consumption of time, tends to make up bulky records and protract the trial of such causes to an unreasonable length.
“Another evil which accompanies, and is, to a certain extent, consequent upon the employment of the stenographer’s art — one of which we have heard both appellate practitioners and judges complain bitterly — is the unwarranted and unnecessary lengthening and elaboration of records. The facility of saving exceptions leads to the preservation of frivolous points in which there is no merit, and the result is that when the case gets into the appellate court the record is so incumbered that the two or three salient points upon which the decision of every case turns at last are lost among the mass of frivolous exceptions, upon which counsel do not and cannot rely, but which they have saved in consequence, we suppose, of some shadowy idea that such a course is ‘ trying a case *548 thoroughly.’ We believe that the inevitable waste of the time of the appellate courts, consequent upon this practice, is one of the most fruitful causes of the blockade which exists upon their dockets. Some check should be devised which would tend to prevent this abuse of the right of saving exceptions, though we confess we find it easier to point out the difficulty than to suggest the remedy.”
The present case is not, however, near so voluminous as it would have been if counsel for plaintiff in error, defendant below, had been permitted to introduce all the testimony which they desired to introduce. For instance, although the court below permitted such counsel, in the cross-examination, of the plaintiff below, who was a witness in his own behalf, to ask questions with regard to almost every thing with which the plaintiff had at any time been connected for several years prior to the time of the arccident, yet that did not satisfy counsel. They desired to follow the plaintiff through life, from his earliest infancy up. They desired to prove hot only, his birthplace, his attendance at the various schools which he attended during his childhood, his different places of residence at various times during his life, and all the principal incidents of his life, but they also desired to go still further back into past events and prove the nativity of his parents. At the time of the trial, Trosper was over 49 years of age. Also in the cross-examination of the plaintiff’s attending physician, who had testified as a witness for the plaintiff, the counsel for the defendant desired .to ask this witness concerning the difference in methods of surgical and medical treatment practiced in the present century, as compared with the last century. The court below gave great latitude to counsel for defendant in the cross-examination of plaintiff’s witnesses, as well as in the examination of their own witnesses; but still the court below did not give to counsel the unbounded license which they desired in these respects, but, as compared with what counsel really desired, limited such examination and cross-examinations to a very great extent.
As above stated, counsel for plaintiff in error urge in this *549 court sixty-two assignments of error; but out of that whole number we do not think that there is more than one that is sufficiently available to require a reversal, or any considerable modification of the judgment below. We think the court below committed some errors, but in nearly all, instances these errors were clearly immaterial. It is error for a court to permit the inti’oduction of irrelevant testimony, and in this respect we think the court below committed errors; but the errors thus committed were principally on the side of the plaintiff in error, defendant below. We think the court below also erred in giving some irrelevant instructions; but we do not think that any of the errors in this respect were material. Judgments are never reversed because of the irrelevancy of the evidence introduced, or the irrelevancy of instructions given, unless it can be seen that such evidence or such instructions might have misled the jury to the prejudice of the party complaining.
I. We think the court below erred in permitting J. M. Taylor to serve as a juror. His examination upon his voir dire was as follows:

(By Counsel for Plaintiff.)

“Question: Mr. Taylor, how is it with you? Answer: I have heard considerable about it.
“Q. Have you any bias or prejudice for or against the plaintiff? A. No, sir.”

(By Counsel for Defendant.)

“Q,. Mr. Taylor, are you acquainted with the plaintiff? A. Yes, sir.
“Q,. How far do you live from him? A. About four miles, I guess.
“Q,. How long have you known him? A. Well, I have known him nearly ever since I have been in the state — eight years.
“Q,. Intimately acquainted with him? A. Not so very intimately acquainted with him; I know him.
“Q. Connected with him at this time in any business relations or anything of that kind? A. No, sir, none whatever.
*550 “Q,. Do you do your trading mostly at this place? A. Yes, sir, pretty much altogether.
“Q,. Have you any feeling or prejudice against the city of Salina, or citizens, or as a municipal organization? A, No, sir.
“ Q,. Never had any difficulty or trouble with the city in any way? A. No, sir.
“Q. Never expressed yourself as having any such feelings? A. No, sir.
“Q,. Do you know anything of the facts in this case? A. Well, I presume I do. I have heard considerable said about it. I went to see Mr. Trosper when he was on the bed here in Salina, within a day or two after he was hurt. I have talked with him about the matter to some extent, and I presume you would consider that I know something about it.
“Q,. Did you form or express any opinion about it? A. I do not know that I did express any opinion. If I did it was conditional.
“Q,. Have you any opinion in regard to the injury of Mr. Trosper that he received? A. Yes, sir; I-have an idea that he has received that injury.
“ Q,. Have you any opinion in regard to the extent of that injury? A. No, sir.
“Q,. You never made a special examination of his injury? A. No, sir, only just as he told me about it. He told me about the fractured knee, but as to the permanency of the injury, or the extent, I do not think I ever expressed any opinion. -
“Q,. You have no opinion as to how that injury was caused? A. Only by hearsay, as the others have told me.
“Q,. Who else have you talked with besides him? A. I could not say.
“Q. Anybody claiming to know the facts in the case? A. I believe I talked with a party that claimed to be with Mr. Trosper that night.
“Q. Mr. Taylor? A. Yes, sir; I think he told me he was beside him when he dropped in.
“Q. Is your mind in such a condition that you could act with perfect impartiality between Mr. Trosper and the city of Salina, in regard to any liability that he [it] may have sustained [incurred]? A. I think I could, sir.
“ Q. That question with regard to such liability of the city did not come up in your conversation ? A. I do not remem *551 her. It very naturally would if I talked. I do not know whether I had any conversation in regard to that.
“Q,. Did you see him more than once? A. Yes, sir; I believe I called on him two or three times.
“Q,. How lately have you had a conversation with him? A. Oh, it has been probably a year or more since I have conversed with him in regard to that. I have frequently asked him how his knee was, or such as that. In regard to the extent, I have not talked with him since that.
“Q,. You think that notwithstanding what you may have heard in regard to the extent, you could disregard all.such" opinion you may have formed, and decide the case according to the law and evidence? A. Yes, sir. If I expressed an opinion or formed one, it was only conditional.
“Q,. Did you ever sit on a jury before? A. Not in this state.
“Q,. Did you elsewhere? A. No, sir, I believe not; only ■on the grand jury in Illinois.
“Q,. You are not related to Mr. Trosper in any way? A. None whatever, sir.”
The challenge for cause, and the action of the court thereon, was as follows:
“Mr. Hiller: I suppose that Mr. Taylor is hardly competent?
“The Court: Have you any questions to ask?
“Mr. Mohler: I did not pay any attention to the questions.
“The Court: He said if he had formed any opinion upon this question, it was conditional.
“Mr. Hiller: He visited this man at the time he was injured.
“The Court: That was a mere act of humanity.
“Mr. Hiller: He said he inquired into the extent of the injury.
“The Court: No, sir; he did not. I believe you said you could try this case fairly and impartially?
“The Juror: Yes, sir.
“The Court: And further, that you have no opinion in regard to this case?
“The Juror: Only a conditional opinion that if such aud such are facts, I could not help but have an opinion. Evidence to the contrary would of course remove that.
“The Court: Do you believe that if such and such are facts, you would have an opinion upon that, or is your mind free at this time to act on the evidence produced here?
*552 “The Juror: I can try the case according to the law and testimony, without any prejudice to either one or the other.
“The Court: Are you able to discard everything that you have heard, and sit there with the case clear in your mind?
“The Juror: Yes, sir.
“The Court: Have you any opinion in regard to the facts-of the case?
“The Juror: I have to this extent, that Mr. Trosper sustained a damage.

“Judge Humphrey: Injury?

“The Juror: Yes, sir, an injury; that is all the extent.
“The Court: But the extent of that injury? .
“The Juror: I don’t know.
“The Court: But as to the extent of that injury, you don’t know whether he was in the wrong, or the city?
“The Juror: No, sir; I don’t know.
“The Court: I think I will overrule the challenge. ,
“Mr. Hiller: We except.”
The defendant exhausted all its peremptory challenges of jurors upon others, and this juror was permitted to remain with the jury and to serve as a juror.
It appears from the examination of this juror that he was a neighbor'of the plaintiff; that he visited the plaintiff within a day or two after he was injured, and at other times afterward; that he saw him while he was lying in his bed in the city of Salina, suffering from the effects of the injury; and that he had conversations with the plaintiff with regard to the injury, and that he had some opinion with respect to some of the material facts in the case; and therefore we think he should have been discharged.
Upon the plaintiff’s motion for a new trial, evidence was introduced for the purpose of showing that the verdict was obtained by means of each juror marking the amount which he believed the plaintiff was entitled to recover, and then adding all the amounts together and dividing the aggregate by twelve, and allowing, the quotient to be the verdict.
Now while we do not think that the evidence showed that the verdict was procured in this manner, yet it showed that all- the .jurors settled upon and announced an amount which *553 they severally believed the plaintiff ought to recover, and the amount which the juror Taylor settled upon- and announced was greater than that of any other juror. One of the jurors testified that eight of the jurors agreed upon $3,982 as the amount which the plaintiff ought to recover; that another juror stated that he believed the verdict should be for $5,000, while the juror Taylor fixed the amount at $8,000; and that in order that the juror Taylor should come down to the amount finally agreed upon — which was $4,030 — these eight jurors agreed to go up to that amount,'that is, they agreed to add $48 to the amount which they had already agreed upon in order to procure a unanimous verdict. . Another juror states substantially the same thing, although he does not seem to do it quite so intelligently as the other juror, and differs from him in some particulars. He thinks that the amount upon which' the eight jurors agreed was $4,000. All the jurors were present in the court room at the time that this testimony was given, and Taylor did not attempt to contradict it, although all the jurors were asked if what had been testified to was substantially correct. Evidently, Taylor desired to give the plaintiff a large verdict, and probably this was the effect of having his sympathies aroused by seeing the plaintiff within a day or two after he was injured, and hearing his stories with regard to the injuries, and afterward seeing the plaintiff in his crippled condition, hobbling about with canes and crutches — that is, he probably formed his opinion with regard to the amount of the damages which he believed the plaintiff ought to recover as much from what he had seen and what he knew outside of the court room as he did from Avhat he saw and heard in the court room, while the other jurors formed their opinions from the evidence in the case. It is probable, therefore, that permitting this juror Taylor to serve on the jury was prejudicial to the defendant. If he had not been serving as one of the jurors and urging the jury to find a large amount in favo.r of the plaintiff and against the defendant, probably the'eight jurors would not have agreed upon even as large an amount as $3,982. This *554 error in permitting this juror to serve in this case will require a reversal of the judgment of the court below.
The cause will be remanded for a new trial; but we hope, that in fact no new trial will ever be had, and certainly not such a trial as was had in the first instance. The city is liable, and should be willing to compromise with the plaintiff, and to pay him a just and fair compensation for his injuries, whatever that may be.
But as the cause must be remanded for a new trial, we shall proceed to consider some of the other questions involved in the case. We shall not attempt, however, to follow the plaintiff in error through all its sixty-two assignments of error, or to discuss separately all the numerous points made by its counsel. To do so under any circumstances would be an inexcusable folly, and to do so under the present circumstances would be a reprehensible waste of time. It is barely possible, however, that within the great mass of immaterial mat-, ter contained in the voluminous record brought to this court, there may be something of sufficient merit to be entitled to special consideration, which is so covered up as to elude our observation; yet we shall endeavor to discuss and decide all the main questions involved in the case, and everything that really merits discussion or decision.
II. The next most difficult question in this case is probably the question whether the city had sufficient notice of the existence and condition of the hole or cellar-way into which the defendant fell, to make the city responsible for its condition on the night of the 29th of April, 1878, when the accident occurred.
The principal portion of the uncontroverted and unquestioned facts of the case, stated briefly, are in substance as follows: In the years 1877 and 1878 there was a building erected on lots 109 and 111, on the southeast corner of Seventh street and Iron avenue, in the city of Salina, Kansas. This building fronted west and on Seventh street, and was erected by an association of private individuals, and not by the city, and was known as “the opera house.” The hole, *555 or excavation, or area, or cellar-way, into which the plaintiff fell, was made by this association, and not by the city. This hole was on the east side of Seventh street, and on the west side and in front of the opera house, and was four fpet wide, nine feet deep and thirty-six feet long, and was left a great deal of the time without any guards, or railing around it or •any cover over it. The entrance to the opera house was just south of the south end of this hole. At this place the sidewalk in front of the opera house was twelve feet wide; but at the place where the hole existed, the sidewalk was only eight feet wide, the hole occupying a portion of the space which should have been occupied by the sidewalk. On the night of the 29th of April, 1878, the time when the plaintiff was injured, this hole was left uncovered, and without any guard or railing, except a common door and a dry-goods box, placed at the south end of the hole. On that night a public entertainment was given at the opera house by the Nellie Boyd theatrical troupe, and the opera house was nearly filled with people. The plaintiff attended that entertainment, arid at the close of the entertainment, which was about eleven o’clock at night, he with others, passed out of the opera house upon the sidewalk, and started north toward Iron avenue. The sidewalk was crowded with people, and the crowd moved slowly; and the plaintiff, wishing to move more rapidly than the crowd was moving, stepped to the right, desiring to pass some of the persons who were immediately in front of him, and, when' he was about opposite the middle of' the hole, stepped off the sidewalk into the hole, and fell to the bottom, and by the fall was greatly injured. His left knee-pan was fractured, and possibly, also, the lower portion of his thigh-bone; and the front portion of his skull-bone was also slightly fractured. Because of these injuries, he had to employ a physician and surgeon and nurses, and was not able to attend to any business for a long time.
The controverted facts would seem to be substantially as follows: Did the city have any sufficient notice of the condition of that hole on the night of the 29th of April, 1878? *556 And if it had any such notice, what was the notice, and was the city negligent in not making the place safe and secure? Was the plaintiff intoxicated at the time of the injury, and was he guilty of any contributory negligence? What was the extent of his permanent injury, and what amount of damages should he recover, if entitled to recover anything?
The general verdict and special findings of the jury are as follows (omitting the title of the cause and the signature of the foreman of the jury):
“general verdict.
“The jury impanneled and sworn in this action do upon their oaths find foy the plaintiff, and do assess his damages in the sum of four thousand and thirty dollars-cents.”
“special pindings asked by the dependant.
“1. Did the city of Salina have actual knowledge of the condition of the sidewalk on the evening of the 29th day of April, 1878, and if so, state how and to what officer or officers such knowledge came? Answer: They did, by notice of Messrs. Culp and Bond to the city marshal.
“2. How long before the accident had the sidewalk remained in an unsafe or dangerous condition ? A. The testimony does not show the exact length of time.
“ 3. How long before the accident had the excavation been left in an unsafe or dangerous condition? State particularly the hours, days or months. A. The testimony does not show the exact length of time.
“4. Was the excavation in the sidewalk left continuously in an unsafe or dangerous condition from the commencement of the building up to the time of the accident? If not, state how much of the time it was protected. A. The testimony does not show the exact amount of time that it was protected.
“ 5. Was the defendant guilty of ordinary negligence after knowledge in regard to the condition of the sidewalk at the time of the accident? A. Yes.
“ 6. Was the plaintiff at the time of the accident guilty of ordinary negligence which directly contributed to his injuries? A. Very slight.
“7. If you find for the plaintiff, then what amount do the jury allow the plaintiff for loss of time? A. $250.
“8. What amount for expenses for medical attendance? A. $225.
*557 “ 9. What amount for all other expenses of nursing and sickness? A. $207.
“ 10. What amount for physical pain and mental suffering? A. $1,284.
“10J. What amount for permanent injury? A. $2,064.
“12. Did the accident happen to the plaintiff while he was in the act of attempting to get by the crowd ahead of him, and while he was going at a faster-pace than the crowd was going? A. The testimony shows that he was going faster than the crowd.
“ 13. If the plaintiff had taken his position with the balance of the people there on the sidewalk at the time immediately before the accident, and had walked along with them at the same pace and circumstances, would the accident probably have happened? A. Probably not.”
We think the general verdict and special findings of the jury are sustained by sufficient evidence;, but the special findings, being asked for by the defendant and not by the plaintiff, do not contain, nor do they purport to contain, all the facts involved-in the case.
• Mr. L. M. Tuttle, the city marshal, testified among other things as follows:
“ Q,. What was going on that night in town, if you know ? A. The Nellie Boyd theatrical troupe performed at the opera house.
“ Q. State if you noticed during the day or that evening the opening on the west side of the opera house, or cellar-way? A. Yes, sir.
“Q. Describe the condition it was in during that day and evening. A. During the fore part of the evening the area was open — the space that you have reference to.
“Q,. All open? A. All open.
“Q,. Well? A. Soon after the performance commenced, or about the time it had commenced, I took a door and placed it at the end of the opening, a protection from the building,-and ran it out past the space, and placed a dry-goods box . . . and placed a lantern on the box. . . .
“Q,. Howdidyou cometo placethem there- — atwhosesolicitation and request? A. I thought it was not safe without any protection, and I talked the matter over with Mr. Bond and Mr. Culp, and I think Mr. Radeliff, the mayor.
*558 “Q,. You talked the matter over with them, did you? A. Yes, sir.
“Q. Did you make the suggestion to.them, or did they make the suggestion to you? A. I think Mr. Radcliff made the suggestion to me. •
“Q,. He was then mayor of the city? A. He was then mayor of the city.
“ Q,. Were you there at the time that Mr. Trosper fell into the hole? A. I was not.
“ Q,. Was there any obstruction or any safeguard or protection or railing placed to the side — that is, next to the walk, that space between these posts lengthwise? A. I think not.
“Q,. Nor any at the north end — simply at the south? A. Nor at the north end. ■
“Q. State how long that opening had been in the condition in which you found it that evening? A. I could not tell. It had been some time. I had notified the opera-house association two or three times about it, and they had referred me at that time to the contractors. It had been covered, with plank part of the time. At one time there was a railing of boards put up around it.
“Q. How long immediately preceding this night of the theater had it been in this unsafe and dangerous condition? A. Well, I could not tell. Probably two or three days.
“Q,. Not any more than that? A. I do not think it had. I think it had been covered until within two or three days of that time.
“Q. In what way? A. With plank laid across it.
“Q,. When did you first notify the opera-house association of the dangerous condition ? A. I don’t recollect. I notified them at different times during the erection of the building.
“Q,. How came you to notify them if it was covered with these plank? A. They would come off, and then there would be a different railing around it. At one time there was a railing of boards put up.
“Q. How long were these protective things put on the hole? A. Well, I could not tell.
“Q.. As much as a day at a time? A. Yes, sir, several times; sometimes these were taken off a day or two at a time.
“ Q,. Then you would notify them ? A. No, not the opera-house association, but the contractors.
“ Q,. How long prior to the opening night by the Nellie *559 Boyd troupe was that walk used as a walk by pedestrians? A. I don’t recollect. I should think about ten days or a week.
“ Q. Was it as much as two or three months? A. I should not think it was. My memory is deficient abou-t that matter.
“ Q. Had you been notified by the mayor to see that these holes were properly protected? A. Yes, sir.
“Q. Had you notified the contractors? A. I had.
“Q,. Who did you notify? A. I notified Mr. Kreuger.
“Q,. Who was Mr. Kreuger? A. He was one of the contractors on the opera house.
“Q,. One of the firm of Kreuger & Parker? A. Yes, sir.” •
George Kreuger, of the firm of Kreuger & Parker, contractors, testified among other things as follows:
“Mr. Radcliff (the mayor of the city) came to me one day and told me if we did not have a sidewalk there pretty soon that he wanted a fence around the areas to keep the people from getting to them, and we went to work to build a fence there. The fence was around to the front side — the areas were covered with planks. Never had a fence on the west side; always covered the holes with planks.”
At the time of the accident the opera house was not yet-fully completed, and men were still at work upon various parts of it. The Nellie Boyd theatrical troupe entertainment was the first public entertainment or public meeting given or held in the opera house, and there, were nearly five hundred people present at this entertainment. The old sidewalk fronting the opera house, which was a wooden sidewalk, had been torn away, and a new brick sidewalk had been constructed. Next the hole, however, into which the plaintiff fell, there were slightly elevated curb-stones. This new brick sidewalk had been completed about eight or ten days before the accident occurred. It was also constructed by the firm of Kreuger & Parker, who were preparing, at the time the accident occurred, to put up an iron railing around the hole, though nothing yet had been done except to put up two iron posts, one at the northwest corner and the other at the southwest corner of the hole.
*560 We think the city had sufficient notice of the dangerous •character of this hole. It had been in existence for months. It had never had any railing of guard around it. It had never been covered up, except with loose boards, and these loose boards were often removed, leaving the hole entirely •open and exposed. It was in a public place in the city, where many persons necessarily traveled. It was wholly within a public street of the city; and in this state abutting lot-owners have no title to the land upon which a public street is located. The opera-house association (which was the abutting lot-owner in the present case) had no legal interest, no lawful right in or to the ground or space where this hole was •situated, except the right to use it as a street or sidewalk, for travel and transportation, and for ingress and egress to and from their lots. To use it for any other purpose would be an infringement upon' the rights of the public. The hole had been left entirely open, unguarded and unprotected for at least two or three days before the accident occurred ; and the mayor .and city marshal had actual knowledge of its condition. We think the notice to the mayor and city marshal was sufficient. It is the duty of cities to see that their streets and sidewalks are kept in a reasonably safe condition; and it is the duty of the mayor, as the executive officer of the city, to see that all laws and ordinances are enforced, and that all subordinate ■officers perform their duty. Even if it should devolve upon the city council entirely to keep the streets and sidewalks in safe condition, still the mayor is the president of the council, and has the power to order special meetings of the council whenever he*may choose; and therefore, while notice to the mayor might not be a direct notice to the city council as a corporate board, yet we think in such cases as this it would be notice to the city.
It has recently been held by the supreme court of Indiana, in the case of the City of Logansport v. Justice, that notice to a single councilman, in such cases as this, would be notice to the city. (20 Am. Law Reg., p. 796; see also note appended in such case, p. 803.)
*561 In Maine, it has been held that notice to two or more of the inhabitants of the town, capable of communicating the information, is sufficient notice to the town. (Mason v. Ellsworth, 32 Me. 271; Tuell v. Paris, 23 Me. 556; French v. Brunswick, 21 Me. 29. See also Rowell v. Williams, 29 Iowa, 210; Brooks v. Somerville, 106 Mass. 271.)
Notice may be implied from circumstances, in the absence of express notice; thus, where the defendant has the means of knowledge, and negligently remains ignorant, such means of knowledge are nevertheless always held to be equivalent, in creating liability, to actual .knowledge itself. (20 Am. Law Reg. 805, and cases there cited.)
In a case like the present, where the city permitted or suffered the opera-house association and the contractors to dig and excavate this dangerous hole in one of the public streets of the city, where neither the opera-house association nor the contractors had any legal right'so to do, except by mere sufferance^ is not the city bound to know at all times the exact character and condition of such hole? And is not notice to the opera-house association, or to the contractors, notice -to the city; which permits such interference with’ its streets? Probably in such cases all parties would be liable; and the liability of the opera-house association or of the contractors would not relieve the city from its liability. The city is bound to use reasonable diligence in keeping its streets and sidewalks in a reasonably safe condition; and where it does not do so, it will be liable for the consequences of its negligence. Under the circumstances of this case, we'think it ought to be held that the city impliedly had notice of the dangerous character of said hole, even if it were not shown that any actual notice was given to either the mayor or the marshal, or to any •other officer of the city. It must be remembered that the hole, into which the plaintiff fell had existed for months, and the very dangerous character of the hole had existed for at least two or three days, and probably for a much longer period of time, before the accident occurred.
*562 In Massachusetts, it has been held as follows:
“A town, through its water committee, agreed with a contractor that he should make all trenches needed for laying water pipes, in such streets as the committee might from time to time direct, and that he should guard and light the trenches by night for the protection of travelers. Held, That the town was nevertheless liable for an injury to a traveler on the highway, caused by negligence in guarding the trenches, although the defect had not existed twenty-four hours, and the town had no notice thereof.” (Brooks v. Somerville, 106 Mass. 271.)
The hole in this case was in fact a part of the street, and was not private property. The abutting lot-owners had no title to the land or ground where the hole existed. In excavating the hole they were simply interfering, by sufferance, with public property.
III. The next question to be considered is whether the plaintiff was guilty of any contributory negligence, or not. This question, together with the question of drunkenness, which it included, was fairly and properly submitted to the-jury, upon proper instructions, and the jury found in favor of the plaintiff and against the defendant; and the verdict of the jury with regard to this matter we think is conclusive, in the present aspect of the case. It appears from the evidence, that before the plaintiff went into the opera house he drank some gin; but it does not appear that he was intoxicated. The opera house was probably brilliantly lighted. The plaintiff came down out of the opera house about 11 o’clock at night; there was no moon shining at that time, and some of the witnesses said the night was pretty dark. There was a lantern hung in the door-way of the opera house. There was another lantern hung on a post in front of the opera house. Whether the lantern that the city marshal had previously placed on the dry-goods box, near the hole, was still there, is not shown. The evidence leaves this matter in doubt. There was another lantern hung on a post near Iron avenue, some distance north of this dangerous hole. *563 These lanterns, it would seem, were all the lights that were placed on the street near the opera house; and from the evidence, it would seem that they furnished only a very poor and inadequate light. Probably, however, the light seemed much poorer to those just coming out of the brilliantly-lighted opera bouse, than it would have seemed to a person who had been on. the street for some time. The plaintiff came out of the opera house into the dark — or rather, into the dim, pale light of these lanterns. He had no knowledge of the-existence of this dangerous hole; he had never seen it before; he attempted to pass by a portion of the crowd and to catch up with his friends, who were just in front of him, and in doing so fell into-the hole and was injured, as above stated. It does not appear to us that he was in fact guilty of . contributory negligence; and we think the finding of the jury in this respect was correct; and in the present aspect of the case we think such finding of the jury is conclusive.
IV. With respect to the special findings of the jury, we would say that the question is not whether they are sufficient to sustain the judgment rendered by the court below; but the question is, whether they are so inconsistent with the general verdict that they would compel a different judgment to be rendered than the one authorized by the general verdict, and the one that was actually rendered. We do not think they are inconsistent with the general verdict; and construing them as we do, we think they are sustained by sufficient evidence. These special findings are findings of only a portion of the facts in the case, and the other facts in the case necessary to sustain and uphold the judgment rendered are included in the general verdict.
The sixth finding of the jury is not, as counsel for plaintiff in error suggest, that the plaintiff was guilty of “slight ordinary negligence,” but is, that he was merely guilty of “ very slight” negligence. Ordinary negligence, which is the absence of ordinary care, would be sufficient to preclude the plaintiffs recovery; but very slight negligence, which is merely the absence of very great care, would not preclude *564 his recovery. This finding may be true, and still the plaintiff may have exercised great care. This finding would simply mean that he had not exercised the greatest possible care.
. V. The tenth special finding of the jury gives $1,284 as damages for “physical pain and mental suffering.” Upon this finding arises the question,'whether anything can be properly recovered for mental suffering under any circumstances. We think it cannot, except where the mental suffering is the natural, legitimate and proximate consequence of the physical injury. We do not think that anything can be recovered for mental suffering as a distinct element of damages in addition to bodily suffering. (Joch v. Dankwardt, 85 Ill. 331; Johnson v. Wells, Fargo & Co., 6 Nev. 225.)
Where mental suffering is an element of the physical pain, or is a necessary consequence of the physical pain, or is the natural and proximate result of the physical injury, then, we suppose that damages for mental suffering may be recovered, even in cases of this kind. (2 Sedgwick on Damages, 7th ed., top page 543, side page 552, note a, and cases there cited.) But the cases are so rare where anything for mental suffering could be recovered in cases of this kind, that parties suing for damages in such cases should generally leave the question of mental suffering entirely outside of their consideration. In the present case we. do not think that any material or substantial error was committed with regard to mental suffering. No mental suffering was proved distinct from bodily suffering, and the case was not tried upon the theory that anything for mental suffering could be recovered, independent of bodily suffering. There was no claim or pretense on the part of the plaintiff that the injury would hurt his character or reputation, or that it would hurt the character or reputation of any of his family, or that it would cause any destitution or want on the part of himself or family, or that it would require himself and family to live more frugally than they had previously lived, or even that it would abridge any of the comforts or luxuries which they had previously enjoyed. He did not claim damages for any insult, or indig *565 nity, or opprobrious conduct, or social depreciation • nor did he claim to be a poor man who needed to recover anything from the city to relieve himself or family from poverty or want. Indeed, he did not claim to have suffered mentally in any respect whatever, except as an element or concomitant of the physical pain which he endured. And for this kind of mental suffering we think the plaintiff could recover, and we do not think that in this class of cases he could recover for any other kind of mental suffering.
The judgment of the court below will be reversed, and the cause remanded for a new trial.
All the Justices concurring.